15-6190, Andrew B. White. We've set aside a half hour for each side, but this is important. I'm not going to be that strict about time as long as you're saying new and interesting things. So, Mr. Greenfield? Ms. Greenfield? Good morning, Your Honor. Good morning, Mr. Lockett and Ms. Brown. I intend to reserve about five minutes for rebuttal. From the outset of Brenda Andrew's capital trial, the State introduced evidence grounded in stereotypes about her as a wife, a mother, and a woman. The State repeatedly invited jurors to envisage her cleavage and clothing, picture her adulterous acts, and even infer guilt from the style and color of her underwear. And at the penalty phase, prosecutors wielded this evidence to foreclose any meaningful consideration of a life outcome. This case is as extreme as it sounds. Ms. Andrew's case is back before you because the Supreme Court recognized that clearly established federal law prohibits the State's use of a duly prejudicial evidence that renders the trial fundamentally unfair. Stereotype-based evidence like that presented here surely fits the bill. Ms. Andrew's trial was fundamentally unfair at both the guilt and penalty phases. At the OCCA, Judge Arlene Johnson clearly understood that Ms. Andrew's claim fairly prevented the impact of sex-stereotyping evidence, writing that much of the State's evidence has no purpose other than to hammer home that Brenda Andrew is a bad wife, bad mother, and a bad woman. Indeed, judges on every panel considering this case have been disturbed by the sex-stereotyping evidence that pervaded Ms. Andrew's trial at both phases. I will address the impact of this evidence at each phase in turn. So tying first to the guilt phase, the State tainted Ms. Andrew's entire guilt phase trial with its use of sex-stereotyping evidence. It anchored the case in tropes about her as a woman, about her sexual behavior. From the outset, from its opening argument, the State made clear what it intended this trial to be about, and then proceeded to do exactly that, opening its case with pastors who spoke about Ms. Andrew's adultery, the very first witness for the State, and explained to the Court that adultery is against the teachings of the Church. Can I ask you a question? Don't we need to evaluate if we apply 2254-D1 under Wellman v. CDLC based on the arguments that were presented in the Oklahoma Court of Criminal Appeals on direct appeal? Do you agree with that? Yes, Your Honor. In the direct appeal, there were no arguments. Nor did John Carlson make any arguments when it was originally before the panel about the testimony of the three pastors. Is that a problem for you? How can we determine that the OCCA's determination on sex stereotypes was unreasonable under pain and clearly established federal law when the Oklahoma Court of Criminal Appeals didn't have the benefit of the argument that you're very well presenting to us? Thank you, Your Honor. So this argument, the claim is exhaustive. I understand that the claim was exhaustive, but I'm not asking you about exhaustion. I'm asking you, under 2254-B2, even if the claim is unexhausted, a habeas court can deny the claim on the merits, correct? Yes. And so assuming that it was exhaustive, do you agree with Ms. Crabb that the Oklahoma Court of Criminal Appeals did adjudicate this claim on the violation of a fundamentally unfair trial on the merits? Do you agree with that? Yes, Your Honor. All parties agree that this claim has been adjudicated on the merits. And with respect to your question about the pastors, to the extent that the claim now includes additional record citations, additional examples, the nature and substance of the claim has not changed. And so in providing additional examples, the claim now is simply adding color to a claim that was presented below and that everybody agrees has been exhaustive. And so at the OCCA, the claim that the OCCA had was grounded in evidence about slurs used against Mr. Andrew, the word hoochie, for example. Take that. I'm surprised. That was objected to and the judge sustained the objection to the use of hoochie. Isn't that right? That's correct, Your Honor. And the comment was not struck. That's your complaint, it wasn't stricken, even though the judge said the objection is sustained. The judge said the objection is sustained and the jury still had the word and the word was not stricken from the record. In addition, the claim before the OCCA talked about evidence about Ms. Andrew's cleavage. That came in through David Ostro, a witness who presented testimony on the third day of trial. There was evidence about her dyeing her hair red. The claim was premised on many of the themes that we are discussing today, and that has been presented to this panel. And in adding additional examples, the claim, we're adding more color to that. And that doesn't render the claim changed or different. There's not new evidence being presented. Everything that is before this panel was before the OCCA. Everything is drawn from the record, and they had a full and fair opportunity to adjudicate that claim based on the record. Further, the OCCA was required. How was it before the OCCA if there was no complaint that the evidence was inappropriate at the time, the specific evidence? If there was no mention, as Judge Bacharach was asking, about the impropriety of the testimony of the ministers and things like that, how was it actually presented to the OCCA? They weren't asked to consider that evidence in determining whether it was an unfair trial, were they? They were asked to consider that evidence, Your Honor.  Because under the OCCA's own jurisprudence and under federal law, the OCCA had to evaluate the evidence that was enumerated in Ms. Andrews' brief in the context of the trial. And the context of that trial is sex-stereotyping evidence that came in every single day. For example, the claim was called- Was there even an argument that there was sex-stereotyping evidence? Yes, Your Honor. That argument was made to the OCCA? That argument was made to the OCCA. Ms. Andrews' brief before the OCCA, in talking about evidence around her affairs, in talking about evidence around her clothing and hair, she argued that that evidence reduced her to a venal caricature in the eyes of the jury. That's at page 42 of her brief. She argued that this evidence made the trial more a referendum on her life. That's also at page 42 of her brief to the OCCA. She argued that this evidence was presenting her as a bad person because she had affairs, and arguing that the evidence was presenting to the trial antiquated beliefs about the appropriate behavior of women. So while we agree and accept that Ms. Andrews does not use the term sex-stereotyping, she does not use that particular label in her briefing before the OCCA, the claim was clearly presented as a claim grounded in sex-based stereotypes. And we need look no further than Judge Johnson's dissenting opinion at the OCCA to see that that was the case, because she clearly understood what was being presented to the court there. She clearly understood that this was about evidence painting Ms. Andrews as a bad woman. The first paragraph of her dissenting opinion talks about how much of the state's evidence had no purpose other than to hammer home that Brenda Andrews was a bad wife, a bad mother, and a bad woman, and that a defendant should be convicted, if at all, of the crime charged, and not of being a bad woman. I don't think there's any way to read that dissent other than understanding the claim that was before her, which was about the evidence of sexualization of Ms. Andrews, the evidence of her hair, of her clothing, of her appearance, of the sex acts, of the long history of her sex life. But that was about stereotyping, about painting her as a bad woman, and inviting the jury to infer guilt because she is a bad woman and acted as a bad woman, and therefore had the propensity to act as a bad woman on the day of Mr. Andrews' murder. Why wasn't it briefed and argued that way, then? It would have been simple to do what you're describing now. I think it was briefed that way, Your Honor, and we have the luxury here of multiple pages devoted to this single claim because that's the only claim that's come down on remand. Nearly 20 claims were presented to the OCCA, so naturally I think it's inevitable that there were fewer examples. Even in our briefing here, we didn't include all of the examples that we found in the trial transcript of this kind of evidence due to page constraints. But I think the argument that she makes in her brief makes it very clear that this is what was presented to them, and Judge Johnson's dissent makes very clear that this is the claim that they considered and they denied, unreasonably so. And so the fundamental question that now is before this panel that has come back on remand is whether this unduly prejudicial evidence rendered Ms. Andrews' trial fundamentally unfair. Let me ask you about the nature of the evidence a little bit. The state could put on evidence of motive. You agree that that's appropriate? Correct, Your Honor. Sex is sometimes a very strong motive that causes people to do very bad things. Do you agree? Yes. So why wasn't the relationship between Ms. Andrews and Mr. Provides relevant? And that's what the pastors, I'm not sure what the clergy would refer to it. That was the nature of the evidence there, showing this very strong relationship. This wasn't just a couple who were friends, they taught Sunday school together. Why the heck would they murder anybody in that circumstance? Why wasn't the relationship between the two relevant? And if the pastor said they were acting so affectionate toward each other and so on, that it was scandalous in the church. Why is that not relevant? I think the Supreme Court in its second footnote addresses this question somewhat as well. We agree that the fact of the affairs has prominent value here for all the reasons that you've explained, Your Honor. It's the detail that is elicited from witnesses about those affairs that puts this trial over the pail. It's the detail about the sexual relationship, about where this happened, about... Speak specifically about what the first witnesses talked about. I'll call them the pastors. Yes. They were talking about what was done in public at church, essentially, right? Why was that over the top? Why wasn't that relevant? Could they just say they seemed very affectionate toward one another and leave it at that? Is that all the government's allowed to do? They could have said that, Your Honor. They could have said that there was behavior between the two observed and left it at that. But the prosecutor's elicited testimony beyond that, inviting the pastor to condemn adultery as the first witness in the trial. This is on the first day of trial. And the problem here arises not less from looking at each individual piece of evidence, but looking at the cumulative impact of this evidence on Ms. Andrew's trial as a whole, which is the essence of the fundamental fairness inquiry here. Building on the testimony from Pastor Siner, who testified about how adultery is a sin and must be condemned as the first witness, the state built on that with further testimony about Ms. Andrew's previous affairs, adding detail with the testimony of Mr. Higgins, who was presented on the second day of trial. That went into extensive detail to an extent that it makes for very uncomfortable reading, and that's worth on the page. Well, it was relevant for him to say that she had told him she hated her husband and wished he were dead. You agree? Correct, Your Honor. That's a remarkable statement for a woman to say to a guy. Wasn't it relevant to bring out their relationship and how they met? That was done with all the other witnesses. They were told, okay, how do you know these people? How did you get involved with them? Why was that totally irrelevant with respect to Mr. Higgins? So we agree, Your Honor, that the statements – I think there were three statements in the context of Mr. Higgins' entire testimony that have probative value, the one that you have isolated there in particular, and some context about why she might have shared that with this person is totally appropriate. But where did you have sex?  Whose car? My car. Where else did you have sex? Motel. She put the motel key in his hand. What was she wearing? How did they meet? She rubbed up against him. She touched him. She placed the key in his hand. This testimony is painting a picture for jurors. This goes far beyond establishing the nature of the relationship between the two. And Ms. Andrew even stipulated for the existence of these relationships at page 338 of the trial transcript. But the gratuitous detail there, that's really painting this picture of Ms. Andrew and how exactly they had sex and what shoes were and how many times they went to the motel. That far exceeds anything that is necessary for the prosecution to establish the nature of that relationship there. And the same was done with Mr. Pavatt as we move further on in the trial, on the 12th day of trial, with Witness Dean Gigstad, who was invited from the witness stand to have a reenactment of sorts, of an encounter that happened with Mr. Pavatt. By that point, the existence of the relationship between these two parties had been well established. And there was no dispute about that. There was no dispute that this was a sexual relationship. The eliciting testimony from his daughter to speculate about how many people Ms. Andrew may have slept with added nothing to the nature of that relationship. Having this reenactment with the witness of how close Mr. Pavatt and Ms. Andrew might have been on the decking is, again, inviting jurors to really picture this, to paint a picture in their mind. And that's the impact of so much of this evidence. If I were to hold up a pair of women's underwear in this courtroom today, I'm fairly sure that that's the only thing that this argument would be remembered for because it's incredibly emotional, incredibly emotive. And this isn't a theoretical exercise. That happened in Ms. Andrew's trial. And I don't want to interrupt you, so I apologize. But let's take your hypothetical that you hold up a pair of long underwear and that's maybe a memorable image to us. But let's take that example. If this is a direct criminal appeal and you hold that up, and that had not been argued in district court, but you raise that, and then your argument is that the federal district trial may be conducted in this courtroom was so laden with inappropriate sexual innuendo and the like, and then you hold that up, and that is part of the record, but that was not presented in district court. And let's say hypothetically that the standard of review in a direct criminal appeal, and this is a hypothetical, is whether or not the district court unreasonably determined what, you know, made a conclusion based on what the evidence was presented. Wouldn't it be unfair, in a sense, to say, well, the district court failed to consider the fact that the defense lawyer held up a pair of long underwear and that that was in the transcript. It was never mentioned in the transcript, but we are privy to that as an appellate tribunal. And isn't that the problem that was enunciated in Wellman v. CDOC, that when a claim is adjudicated on the merits that, you know, Oklahoma Court of Criminal Appeals does the same thing that we do, that every single appellate tribunal does, and that is the party presentation rule. We adjudicate issues and arguments based on the evidence that is elucidated. And so if we credit what you're saying, that these three passers were in the record, not mentioned to the Oklahoma Court of Criminal Appeals, that the, let's say, to follow up on Judge Hartz's question about the hoochie comment, Ms. Droslow's testimony, and nobody has presented, it is sustained, maybe not stricken, but isn't, at the end of the day, our inquiry under 2254 D1, whether or not the Oklahoma Court of Criminal Appeals unreasonably adjudicated the arguments that were presented to us, based on the arguments that were presented to them, just like we're not going to go looking for issues under the party presentation rule based on the arguments, and we're going to confine ourselves to the arguments that you and Ms. Crabb present. Absolutely, Your Honor. The underwear in this situation was presented. That's Proposition 7. I understand. That was part of a hypothetical. I know Mr. Geiger raised that. I see. I thought the only source of the fact of the allegation that he held it up to the jury was because of something in the newspaper. No? Do you have other record evidence of that? Well, I think a reading of the record is clear what's going on. He's saying, would a grieving widow wear this, would she wear this, and later said, would a widow, the grieving widow would not take her song underwear. Okay. The color of the underwear was. . . Contemporaneous reports. Yes, that's true. But the word song underwear in the transcript is clear. That's what he's talking about. And Exhibit 313 has photos of this evidence that went back to the jury. You think that was not at all relevant to the government's argument that this was a grieving widow who needs to escape and get away from things? That's what it was offered for at trial. You don't agree that's at all relevant to that allegation? No, Your Honor. I think that no fair-minded jurist could conclude that a trial that invites a jury to infer guilt from the style of a woman's underwear could be fair. There's no possible inference there from a piece of underwear. Counsel, what do we do if the OCCA says a piece of evidence is relevant? That's beyond us, isn't it? Is that not conclusive on us? State court ruling on state rules of evidence that are akin to the federal rules do not present a federal question for us, do they? That's right, Your Honor, and we agree with the state. All right. I'm sorry, your time's running, and I know that you may get some extra. But once we say that, I'm trying to figure out how to analyze this. We say here are the relevant facts, which we take as relevant because the OCCA said so, and then here are the irrelevant facts that everybody seems to concede, including that. And then our charge is to determine whether or not that evidence, that irrelevant evidence, not the relevant, including the affairs, but the irrelevant evidence, is so unduly prejudicial that the trial was fundamentally unfair. And then we call, in weighing that, we determine how strong was the evidence. If the evidence was overwhelming, then presumably the prejudice diminishes with that. Is that the way you would analyze this, too? I think it would be better to look at what the erroneous evidence is here that the panel is considering in weighing the fundamental fairness question. There are three ways of looking at that. First, starting with our clearly established federal law. Payne says that the issue here is unduly prejudicial evidence that renders a trial fundamentally unfair, and the OCCA was presented both with the state law question and with the due process question, which deals with unduly prejudicial evidence. Second, under Andrew versus White, the Supreme Court has given really clear instructions to this panel in how to look at the evidence on remand, that we're looking at the disputed evidence and factors within that. Is it the disputed or is it the irrelevant evidence? You dispute relevant evidence, don't you? What the OCCA said was relevant evidence. So I think, Your Honor, even if we take just the irrelevant evidence, Ms. Andrew wins, and to your question, Judge Bacharach, as well, even if we're just looking at the evidence that was specifically enumerated before the OCCA, Ms. Andrew prevails. When you say she wins, are you saying that this panel should say there was a 14th Amendment violation, that, in fact, she received a fundamentally unfair trial? Are you taking the extra step, which I think is required, that all fair-minded jurors would say that the OCCA's determination, and I assume you're conceding that it adjudicated the 14th Amendment question. Yes, Your Honor. All right, that you would concede that by adjudicating that, that that's where you're left, that all fair-minded jurors would have to say the OCCA was unreasonably applied pain, and that seems like a very tall order, especially in view of the previous history of this case. Could you respond to that? Yes, Your Honor, because the concededly irrelevant evidence here includes a gendered slur. It includes evidence about her hair color. The state, in footnote 6 of its response brief, has now conceded that evidence about Ms. Andrew's hair and appearance is irrelevant. The evidence that the OCCA also found irrelevant includes testimony about her cleavage, about a dress that was tight and short. I concede the list, and we all have seen the list, and you can rattle it off, and I will nod my head affirmatively that a lot of irrelevant, prejudicial, maybe, evidence came in. But that's not really getting where I need to be, which is that focusing on that totally ignores all the evidence of guilt, and there's a lot of it. And so if you say that this irrelevant evidence prejudices her, and it's a tough standard, so unduly prejudiced as to give a fundamentally unfair trial, that's a lot. For you to say that, first you have to address the overwhelming evidence, or the evidence of guilt that's relied on by the panel previously, as well as the jury in convicting. You have to acknowledge that. And here's the tie that I'm looking for, and where I'm looking for help from you. Because I get that you say this prejudicial information, evidence to the jury, could have worn away on her credibility, or made the jury not like her, and therefore tilted the balance of the jury's deliberation in some fashion. But where I'm left is confused how that fits on anything that mattered in this case, whether it's the brake lines, or it is the telephone calls, it's the shotgun, it's the gig stats where the ammunition is found. None of that has anything to do with her credibility, does it? What is her credibility that this is undermining, that makes that big of a difference in this case? That's where I'm stuck. Respectfully, Your Honor, I disagree. I think her credibility was hugely important to all of that. Which one? How? The shotgun. How was it important for that? Because all of this was contested evidence. Ms. Andrew contested everything in this trial, and so the case rose and fell on her credibility as a counter-narrative, as a narrator, as somebody to present a testimony. What was contested specifically other than two masked gunmen instead of a Mr. Poppett? So, for example, the brake lines, Your Honor, that you mentioned, she had an alternative narrative to that, and that narrative stood no chance. This was compounded by a lack of mitigating instructions. The jury was given no way to understand permissible influences that they could draw about her being a bad woman and a bad person, and compounded by her excluded witnesses as well. That's my point, is you have to acknowledge the overwhelming evidence on that too, which is, it's not just she said, I didn't have anything to do with the brakes, and the jury thought, you're a bad woman, so yes, you did. There's a whole lot more to it than that. The telephone calls, the sequence, the previous threat, her mentioning to Rob, before it was in the newspaper, hey, I saw it in the newspaper that someone tried to cut your brakes. A lot of evidence is built there that has nothing to do with underwear or bikini bottoms or whatever we're talking about, or hoochie or red hair. It just doesn't have anything to do with that. I think looking at how the state presented its own evidence is really illustrative here of how this trial went. The state started, very first line of its opening statement, this is about a controlling woman who liked to cheat on her husband, who had extracurricular activities. The state then presented days of testimony about that. In closing, at both guilt and penalty phases, and at both bifurcated closing arguments here, the state chose to end with evidence of her affairs, and explicitly, the last things that the jury heard before they went off to deliberate at guilt phase and at penalty phase were about how she was a bad woman who was having affairs, in contrast to Rob, Mr. Andrew, who just wanted to love her. Let me ask one question about that. When you're talking about closing, was there any argument to the OCCA about improper closing argument? Yes, Your Honor. About Proposition 13, we saw the OCCA. And what were the things complained of? The complaint out there was that in Proposition 7 was the use of Ms. Andrew's underwear at closing argument, and in Proposition 13, they presented a due process violation based on a closing argument at penalty phase that invited jurors to conclude that she was a bad person because she invited her husband to come home. Closing argument at the penalty phase? Yes. Both were presented to the OCCA. With respect to the guilt phase, the closing argument, the only issue was holding up the underwear. Is that right? From memory, Your Honor, I think that is one of two issues that were presented. Proposition 7 was divided into 7.1 and 7.2. I'm afraid I can't quite remember off the top of my head what was in 7.1. And I'm conscious of my clock ticking out. So if there are no further questions... There are no further questions. Okay. Go ahead. Did you have one? Yeah, but I want to hear yours. Okay. One of the things that I'm just a little unsure of from the Uphill briefing is, and you mentioned Judge Johnson's dissent, partial dissent, in the Oklahoma Court of Criminal Appeals opinion. Now, a lot of the evidence that you are relying on, and your predecessor, Mr. Carlson, relied on to impugn the death sentence, was actually evidence that was presented at Stage 1. And this is a little bit of a corollary to some of Judge Phillips' questions. With regard to the evidence that you contend was improperly elicited at Stage 1 on guilt or innocence, do you have to satisfy 2254D1 or D2 with regard to the introduction of that evidence at Stage 1 before we can consider the issue that Judge Johnson addressed, and that is whether or not, even if it didn't necessarily undermine the fundamental unfairness of the guilt-innocence determination, that it could have impugned the imposition of the death penalty because it only takes one holdout juror. But before we can address that, don't we have to ultimately determine that there was a violation of D1 or D2 with regard to the introduction of the evidence at the guilt stage? So the instructions from the Supreme Court make clear that this panel is to consider the impact of unduly prejudicial evidence at both phases. And I agree with you that they said that. How do we do that? So I think this comes back to the question of what is the erroneous evidence that we're looking at here and what is in that bucket and what was the impact when considered in the context of the entire Phase 1 proceeding and Phase 2 proceeding. And so even if we just take the conceivably irrelevant evidence, the picture that was presented of Ms. Andrew, the drumbeat that was reinforced over and over again throughout the guilt phase, bled into the penalty phase. This was not a foregone conclusion at the penalty phase. The state's penalty phase case lasted half a day, it incorporated its guilt phase evidence and continued its attack on Ms. Andrew's failure to produce tears when asked for, on her affairs, grilling witnesses about whether the fact she had affairs would change their opinion of her. So continue to base this case in gender-based stereotypes and in sex shaming. And at closing argument, the prosecutors have continued to raise these issues. So even if we're only looking at the evidence that has been conceded before the OCCA and here, this still arises to the level of a due process violation because no fair-minded jurist could conclude that a trial which was made about a defendant in the second class was fair. No fair-minded jurist could conclude that a trial that trafficked engendered slurs was fair or that a trial that was focused on her cleavage, her clothing, her short skirt, her tight dress was fair. And all of this evidence, as Judge Johnson said, trivialized the value of her life. The effect of stereotyping is to reduce, to flatten the defendant to a villainous archetype. And that's somebody on whom the jury could very readily pin the crime. Who raised the issue of whether she was a good wife or mother? The state argues that the defense opens the door to this. Yes, when they asked, I think it was Mr. Nunley. But this evidence started coming in far before that. Even the state's argument in its most recent round of briefing that the defense opening argument opens the door to all of this. Well, it was a mitigator. Pardon? It was a mitigator. Yes, it was. I mean, the defense, Mr. McCracken and Mr. Muscovsky specifically asked at Stage 2 for a mitigating circumstance. I mean, I'm not talking over the charge. It's just to put an exclamation mark on this question. You know, that was something that, you know, that Ms. Fern and Mr. Geiger didn't do. That was, they were responding to a mitigator that was solicited by the defense counsel. I think that argument becomes tender, Jonah, when we think about what actually happened here and the nature of the evidence. It's not possible to open the door to prejudicial stereotyping. I think Buck v. Davis makes that very clear. The issue in Buck was the defense witness and testimony by a defense witness. And, nevertheless, the Supreme Court concluded that that single comment grounded in the defender's race rendered the proceeding unfair. On cross-examination, well, let me get back to another point I'd like to follow up. I mentioned this earlier on. You acknowledged that sex could be a motive. That sex could be a motive? Yes, for doing very bad things. People do it all the time, right? Yes. This offense, if she was guilty of it, was cold-blooded murder of a husband by a boyfriend and her working together. How could somebody do that? What would be the motive? Sex, in part. So you just say, okay, they had an affair. Lots of people have affairs without killing spouses. The evidence of the intensity of this relationship, the fact that they would act this way so inappropriately in public, in church, isn't that evidence of the intensity of the relationship between them, which might be relevant to determining whether this was enough to make these two do this evil deed? Why is that not relevant? Why don't we answer that first, and then I might have some follow-up questions. I can see that I'm out of time. Don't worry. Great. Thank you, Your Honor. So I think we come back to the question of what is probative and what is so prejudicial that probative value is outweighed here. Well, sometimes probative evidence can be very prejudicial. It's the nature of it. Yes, yes. And when you've got sex as the motive, how are you going to keep out stuff that is sexual? And even if sex is the perceived motive or is what is being argued in the case. So there's no other motive. Well, money. I think there are other motives on the table here that were presented by the State and the nature of the relationship between the co-defendants being one of them. But that is not, that doesn't green light a trial to just be flooded with endless prejudicial testimony about. Well, and I was going to mention hair and that stuff. I'm talking, I want to focus on the relationship between the two defendants. Why isn't any evidence of their inappropriate, publicly inappropriate sexual relationship, why isn't any of that? Why isn't all of that relevant? Why does the government have to say, no, I'm not going to put on that because that's too damning of them? Why is that not the essence of the case in a way? I think they may have misspoken, Your Honor. Our position is not that any evidence about the nature of this relationship is irrelevant and has no probative value. It's that the gratuitous nature of it doesn't get the jury any closer to it. Why is it gratuitous if it's about their relationship? There was gratuitous evidence. Everybody acknowledges that. But we have to look at that in light of what's already been introduced that's relevant. The fact that Mr. Nunley had an affair, and I think, with Ms. Andrew, I think that's one statement. There's nothing about where they had sex or anything like that. That was relevant because why the heck would she be calling this guy 40 times the day before she leaves town or whatever the specific facts are? So you want to know that they had been very close at one time. That gets in. That wasn't inflammatory. It was an important point to explain their relationship. But that's been attacked repeatedly in your briefs, and it seems to me that was totally relevant in that circumstance. So some of the sexual evidence seems to be quite relevant to motive here or to explain the relationship between a witness and Ms. Andrew. And we have to look at the gratuitous stuff in light of that. I mean, it would be hard to explain a relationship with Mr. Probat without seeing her in a bad light for her sexual behavior. But that was quite appropriate. I'd like to hear what you say about what was wrong with that. Yes, Your Honor. I think we're broadly in agreement that the fact that her relationship has probative value, the fact that this was an intimate relationship has probative value. But we have to look at how this was presented in the context of the full trial, which is endless testimony about multiple sexual relationships. So it's going back to 1982, which is very attenuated time-wise, to build a picture of a woman who has this salacious sexual appetite and uses her sexuality in deviant ways to instill men or to lead men to their demise. And with respect to Mr. Probat in particular, the nature of that relationship, understanding the relationship between the parties, we don't contest that's important. But what was not required was speculation about how many sexual partners she might have had, about the reenactment that happened, testimony from Curtis Jones about how he was tortupated with her because of their sexual relationship. It was reinforced day after day and in the context of a trial that began with testimony about previous sexual relationships and ended with closing argument about two-decade-old sexual relationships. On that, as far as, and again that list of things that everybody has said are irrelevant, I'm trying to figure out your position for sure and now's my chance to find out. So let me ask you, are you saying, regardless of the volume of criminal evidence connecting her to a first-degree murder and a conspiracy to commit one, that if this quantum of that evidence comes in, that it is per se so unduly prejudicial that the trial is fundamentally unfair? Is that your position, every time that this happens? Not every time, I think that's a very case-specific determination that the panel is undertaking here, weighing up how the prejudicial evidence affected the whole trial. And the stronger the evidence of guilt, the less important this other evidence. Do you agree with that? Not necessarily, because I think the Supreme Court has made clear that there are limits, like in the case of Buck. Now you seem to be arguing for a per se rule. I think our position, Your Honor, is that even in the face of inculpatory evidence, which of course there was in this trial, there have to be limits to what the state can do. And the nature, the tenor, the frequency of this evidence was such that the jury painted the entire trial compounded by other errors that were accepted by the OCCA. A couple of questions. First one, a hypothetical. Say that the evidence is even stronger. That a neighbor walks by and sees exactly what happened in the garage and has the state portrays it. Or has a video camera, and video is the whole thing. Would you still be saying today, this was a fundamentally unfair trial, despite that evidence too, because all this salacious details just contaminated the jury start over? Would that be your position? Or would you say that's enough evidence? I think it might depend on the nature of the evidence presented, Your Honor. Certainly at the penalty phase, I think there would be, there is a discretionary inquiry. Turner v. Murray establishes that given the discretionary nature of that inquiry at the penalty phase, that there's plenty of room for bias to seep in. And that's my second question, penalty phase, which goes back to my original problem. And I'm open, but you have to help me here. I see a disconnect. Grant you everything that you say on the irrelevant evidence, and why some of that was introduced is beyond me. But just the same, penalty phase aggravators, remuneration. She has the evidence of insurance policies, there's an $80,000 joint account, so forth. It's nothing to do with her sex life, or sex conduct, or anything else. The second, especially heinous, atrocious, and cruel, nothing to do with all of the things that you're complaining of with merit, has nothing to do with it. So essentially what I'm hearing is, even though she was found guilty on strong evidence that this court has previously described as overwhelming, so what? It's a redo because this sort of thing just can't be permitted. Even though it didn't have an effect on those aggravators. I think due process demands more, Your Honor. And with respect to the penalty phase, it's not simply the aggravating factors, it's then the weighing that has to happen. And the jury has to ask itself fundamentally, is this person the worst of the worst? Is this somebody who should be eradicated from society? And with Andrew's case, she had no prior offenses, she had no violent history. This was an awful murder. Yes, Your Honor. Okay. That affects how jurors decide whether or not to impose the death penalty. Absolutely, Your Honor. And there's so many factors that go into jury's determination at sentencing phases, as this court has recognized, as the Supreme Court has recognized. And when this much bias floods the trial, we can't be certain that that wasn't what tips the scales here, that that wasn't the hatred inspired by her, the strong emotion from this sexualizing evidence. The picture painted of her from the outset of trial over the course of five weeks was not what tips the scales here for jurors when deciding whether or not she should live or die. They didn't find the third aggravating factor, which may suggest that this was a close call. But future dangerousness is often something that matters to jury, because all shifts establishes that a lot. And nevertheless, they didn't find that aggravating factor. And in spite of the other two aggravating factors, there's still a weighing that happens at the penalty phase. So it is a positive spreader, I think. But I do want to follow up on what you just said. So, you know, and I never had your photograph in memory, but I think you said something to the effect that we can't say that it didn't tip the scales. Isn't that actually the problem? Because the Supreme Court, in the recent Andrew decision, put it in the positive, not in the double negative. And we have the loss of 2254-D1. And so isn't the question whether or not the evidence that we can say that the Oklahoma Court of Criminal Appeals unreasonably determined that the evidence was not so unduly prejudicial as to render the trial fundamentally unfair? And in order to accomplish that, we have to do more than overcome a double negative. To overcome the possibility that it may have tipped the scales, we have to affirmatively determine not only that it tipped the scales, but nobody, a fair amount of jurors, as Judge Phillips mentioned, could find otherwise. And so we have basically, I think, three layers that we have talked about. I think you've talked about with Judge Phillips, with the phrase in the Supreme Court's opinion in Andrew, that it has to be unduly prejudicial. Do you agree with, I think, the premise of Judge Phillips' question, and that is we have to consider the impact of the improper evidence as it relates to the legitimately considered evidence? So if it's overwhelming evidence that was legitimately presented that was exclusive of gender, that we have to take into account under the remand instructions. Do you agree with that? Yes, Your Honor. And then we have to take into account, I think, the very first question Judge Hurts mentioned, and that is, you know, if you look through the question in Mr. Oswald's testimony about didn't somebody call her a hoochie, the objection here says to stay. You know, we have to then consider if, even though it wasn't stricken, if that objection is sustained, can that be so unreasonable on the OCCA's part that it applied plain error, or at least it should have applied plain error, that that would unreasonably taint the fundamental fairness of the trial, right? We have to consider whether there was a contemporaneous objection, right? Yeah. And then we have to consider, I think, under Wellman, whether or not the direct appeal presented those arguments. Just like the example that if you make arguments to us, can we say, well, the district court didn't, you know, consider that, but, you know, they didn't have the benefit under the party presentation rule. So it seems like you have sort of a triple difficult burden under D1. You have to overcome the lack of a contemporaneous objection in much of this evidence. I don't know that there was any evidence, any objections to the sexualized nature of the evidence. There were Burke's objections, there were Relevant's objections, but none of the objections that were presented to Judge Bragg seemed like the same objections you're presenting to us. And then you have, you know, the problem under Wellman, that how can we say that an argument was unreasonably dismissed by the Oakland Court of Criminal Appeals when they didn't have the benefit of that argument? It seems like a very difficult burden when you have those layers that are, you know, entrenched in the 2254 D1. I know that's a long compound question, but that's, to be honest with you, that's just what I'm struggling with. So if you can kind of help me out. And the burden under D1 is high. We completely recognize that. The no fair-minded juror standard is a hard one. It's also been expressed as D1 relief is reserved for extreme malfunctions of the criminal justice system. And I would call this case an extreme malfunction of the criminal justice system, where a defendant has been condemned to die in a trial that was so flooded in judgment, debasing testimony about her as a woman. And nevertheless, with the D1 standard, we maintain that no fair-minded jurors could have reached this conclusion when looking at the evidence in the context of the proceedings as a whole at both guilt and penalty phases, because of how this evidence is compounded by testimony that comes in day after day, because of how the state used its own evidence, opening the case with this, closing the case with this, leaving jurors right before deliberations at both phases with images of Ms. Andrew as an adulterer, which was condemned from the first day, and that the fundamental fairness of this trial is beyond dispute. And the framework of the sex stereotyping continues to pervade this case. We still haven't got away from that, which I think shows the power of this kind of testimony. So, absolutely, D1 is a high bar, and I have no qualms arguing for you that this case does arise to that extent. You'll get five minutes for rebuttal. Do you have any questions? No, thank you. Thank you, Your Honor. When you have five minutes, it's to respond to the government's argument. It's rebuttal. Thank you. Ms. Crabb? Good morning. May it please the Court, I'm Jennifer Crabb, Assistant Attorney General. So, yes, Ellie. I plan to begin my argument by focusing solely on the evidence that was contested in front of the Court of Criminal Appeals. I may, depending on how the argument goes, get to the proper scope of the evidence, and of course, at any time, I'm happy to take the Court's questions about that. The guilt stage in this case lasted 17 days. The State called 50 witnesses, and this case alone, not including Gwadir, including opening statements through the State's witnesses, was 3,250 pages. The contested evidence covered approximately 26 pages of that, 26. On the second day of trial, which is the day that Mr. Higgins and Mr. Nunley testified, 20 pages out of 300 was devoted to the contested evidence. And beyond that, there were three days where there were two pages. The red hair, Ms. Larson's testimony about her suspicions that Ms. Andrew had been unfaithful with persons other than her father. That's it. 26 pages. The statement's made, in my brief, that every day there was evidence of this. I didn't read all the forensic evidence thoroughly, but it seemed to me there were days when there was no reference to sex in any way. Forensic evidence, finding the gun in the neighbor's attic, the trajectory of the bullets, whether she could have shot herself, things like that. Was there, when you've gone through about where the contested evidence was, were there days when there was nothing about that? There were many days where there was nothing about that. There was the fifth day, the sixth day of trial, the seventh day there were no witnesses, it was a very brief transcript, no witnesses. The eighth day, the ninth day, the tenth day, the eleventh day, the thirteenth, and the fourteenth. On every one of those days, there was none of the contested evidence. Well, not just contested, maybe at the time, but contested now. Were there any references that they were complaining of during those days? I didn't specifically note everything that is now contested. However, I can just give you an overview. For instance, day five of the trial, the witnesses were related to the insurance policy, somebody from Prudential. They were Mr. Andrews' divorce attorney, Craig Box. There was the woman who worked with Mr. Prevatt, who it appears that Mr. Prevatt used her notary stamp for some paperwork. And then there was somebody who was higher up at Prudential talking about the policy. That was the fifth day of trial. The sixth day of trial was a continuation of the Prudential employee. Certainly, there was the taking of writing samples from Mr. Prevatt to compare to the confession letter. And then there was handwriting expert, David Herrick. That was the sixth day of trial. So certainly, again, I can't tell you with absolute certainty that none of this was referenced in cross-examination or anything like that. But the focus of most of the days of trial was on the evidence of guilt and not anything aside from the motive being sexual. Can I add to Joe's poem? Isn't the counter-argument to that, and I can't remember the great aphorism from Chief Justice Roberts, toxins can be deadly in small doses. We're talking about a murder that happened not yesterday, but 24 years ago, November 20, 2001. And isn't it the elephant in the room that that trial was absolutely laden with nothing but gender, including from the trial judge, telling the defendant in the middle of trial she can't wear pantyhose and saying that you can't wear makeup because you're really pretty. It would be different if you weren't pretty. It's hard to imagine that a county judge would say that to a male defendant, that you can't wear a cologne because you're already a really handsome guy. This is a case where we start with, as I think your adversary pointed out, we start with a lengthy marriage, but it starts with college. These are grown individuals, and then when Rob goes to visit her in college, he finds out that she was sleeping around. They weren't married. And then finds out that she had cheated on him another time before they were married. There are episodes where, you know, how many times did she go to bed with, what's his name, Tracy Higgins, in the car? Where they had sex in, you know, what reason could there possibly be, even if it were relevant, but to say what was the overarching lesson from that trial, this woman is terribly promiscuous. She does not deserve your sympathy, and I think it's really hard to overlook that. I mean, I think you probably, I'm not trying to put you on the spot, but I think anybody listening to that trial or reading the trial would think no male would ever have encountered any of that. Now, you have good arguments. You know, maybe it might have been the same thing if parts of those, if the defendant were attributed, were assigned a role as a controlling male. You know, maybe it wasn't gender related. But then again, you know, a flat asset for a male, you know, how many times did the male, you know, screw his mistresses in the car? This was an atrocious trial. I respectfully, very strongly disagree with that, Your Honor. I would start by just reminding Your Honor of the proper scope. The idea that some toxins are deadly in small doses was not an argument that was made before the Court of Criminal Appeals. The argument in the Court of Criminal Appeals was not focused on the sexual nature of other crimes evidence. As I pointed out in the brief, the proposition covered all kinds of alleged other crimes evidence. But as far as the tenor of the trial as a whole, and that's what I spent the last several days doing, is rereading the entire trial. And it's very isolated. The references that are improper are very, very isolated. And I don't agree, you know, the demeanor. We cited cases in our brief where it was used against men. I'm old enough to remember Scott Peterson, and that was one of the biggest red flags that led police to suspect him was his lack of care, that his wife was missing. And so I don't agree that that's gender, and I very strongly disagree that that was the focus of this trial. Now, I will also put it in the context of what the defense was. The defense in both stages was a character defense. As I believe Judge Hart pointed out, or maybe it was Judge Phillips, Mr. Nunling was asked by defense counsel, you think she was a good mother, right? Yes. You don't think she was the type of person that would do this, do you? No, I don't. Defense counsel talked about where Mr. Andrew had written in his journal that Brenda Andrew was a good mother and she was the spiritual leader of the house. Ron Stump was asked by defense counsel, you told me you think that Ms. Andrew is a good Christian woman, right? Yes. And that's all first stage evidence, and we quoted extensively in our brief from defense counsel's opening statement, where it is, they met in college, guess what? Petitioner was going to a Christian college, but guess what? She got pulled away from her Christian college by Mr. Andrew. And then she was living her best life, one of the best employees her company, her bank, had ever had until, guess what? Mr. Andrew pulled her away and made her move. And then she did it reluctantly. She rebuilt her life and then guess what? Mr. Andrew made her move again. And so character was the foundation of the defense in both stages of this trial. But some evidence you acknowledged was irrelevant. Yes. And your position is, yes, it was irrelevant, but it didn't matter. Correct. Absolutely. In light of the overwhelming evidence that the court has acknowledged several times it's there. We went through it, a lot of it in our brief, but frankly it wasn't even all of it. Barbara Mercer Green, who worked with Mr. Andrew, heard Ms. Andrew say, if you file for joint custody, I will see you dead. Also that I'm not afraid to do whatever I have to do to keep the children from being with you. The plumber, Mr. Head, overheard Petitioner tell Mr. Andrew, I'm going to kill you or have you killed. We know that she asked Mr. Pabat to kill him or if there was somebody who would do it for her. Rod Lott said that Mr. Andrew told her that Brenda wished him dead. She was having him stalked. She knew what time he left his apartment, things like that. She was calling him 30 to 40 times a day harassing him. The stalking wasn't to find when it would be easier to kill him. It was to see whether he was himself having an affair. Isn't that right? That's correct, Your Honor, but it is also relevant to her motive, her absolute obsession with Mr. Andrew and getting him out of her life. And particularly out of her children's lives. She told her friend, they are my children. They're not his. And I don't want them to have a relationship with him. So that was an overwhelming motive that has nothing to do with her affairs, as well as, of course, the $800,000. She got angry when a witness suggested that, well, when you get divorced, maybe you just get a part-time job. And she was angry at the idea that she might have to do that. She wanted that money. Let me take a quick legal detour for a couple of questions. Sure. Page 15, you talk about Chapman as though that fits within our analysis. Chapman doesn't apply here, does it? Your Honor, it's not entirely clear, because the Court of Criminal Appeals did say that the evidence that it found to be wrongly admitted was harmless. But not harmless beyond reasonable doubt, which would be required for Chapman, right? True, but it is not clear from the language of the Court of Criminal Appeals whether they were saying it was harmless as a matter of state law or whether they were saying it was harmless in terms of the due process analysis. Other places they use those magic words, beyond reasonable doubt, for harmless. There they did not. Sure. So are you really, really asserting Chapman? I think it's relevant. I think that you can look at the cases where it's been argued that they misapplied the prejudice problem of Strickland because they used differing language at different points in the opinion, and you can't necessarily infer. But I don't need Chapman. Certainly under 2254D and the Supreme Court's decision, the fundamental fairness analysis, we still win. And secondly, the question, do you acknowledge or agree that the Supreme Court in the opinion that's sent us here today has said that pain does apply to the guilt phase, even though it was a sentencing phase case? Yes. Okay, thank you. Sure. Judge Phillips, I don't want to talk over to you. Do you have a follow-up question? No. I just want to make sure I understand your answer, the first question of Judge Phillips. I'm still not clear why Chapman or Brown v. Davenport would have anything to do with this, unless this is an alternative argument to affirm, assuming that we credit the petitioner's claim under D1 and D2 and determined that it was not a fundamentally fair trial. Are you saying that my alternative argument to affirm is, under Brown v. Davenport and Chapman, that the denial of a fundamentally unfair trial would have been harmless beyond a reasonable doubt? No, Your Honor. My argument is that the Court of Criminal Appeals found the admission of some of this evidence to be harmless. I get that. But how does that – but if you're not arguing harmlessness as an alternative argument to affirm, I guess I'm just not understanding how Chapman or Brown v. Davenport fit into the element of whether or not the evidence was unduly prejudicial so as to create a fundamentally unfair trial under a ringmate instruction. I think I see two ways to look at the way that the Court of Analyzation is claiming. The first is pain. But the second is that the Court of Criminal Appeals found constitutional error, but found it harmless. And in that case, this Court's review would be under Chapman and Davenport. Which is solely harmlessness, not that they don't address it fundamentally unfair trial. Right? Expressly, that's correct. But we know that they decided the merits of the due process claim. And so it's unclear from their opinion when they said harmless, were they saying this shouldn't have been admitted as a matter of state law, but it was harmless. Or were they saying this may have constituted federal constitutional error, but if so, it was harmless. In which case, this Court would be Brown v. Davenport. I think I'll hit on a couple of points responding to Petitioner's Counsel's argument. Judge Johnson's dissent, I would submit to you that that is not a proper indication, at least not a complete indication, of the claim that was exhausted. And for that point, I would point you to the Donald Grant case and also to the Scott Eisenberg case. In both of those cases, the dissenting judge raised an argument that hadn't been raised by the majority. And in one case, it was specifically like, was this exhausted or wasn't it? And this Court said that we can't rely on the dissent to tell us whether something was exhausted or not. OK, so your argument is that this claim is unexhausted. The claim as it is currently presented, yes. All right. Didn't Moore v. Shulman in 2002 specifically say we cannot deny relief on the merits of the 2254 claim based on some claims? Judge Murphy called it a hybrid adjudication. And dismiss other claims without prejudice for non-exhaustion. And his rationale, as I recall, was that, now, what do we do with a future petition? Is it second or successive? Well, how do we say that if we ultimately say that the unexhausted claims were dismissed without prejudice, which is what we'd have to do? So isn't your argument of non-exhaustion of this claim specifically foreclosed by Moore v. Shulman? Your Honor, I'm not familiar with that case. However, I would say that you can deny a claim on the merits even when it's unexhausted. That's right, but not because of an exhaustion. Then we'd have to reject it on the merits. And if it was unexhausted, how can we say that the Oklahoma Court of Criminal Appeals adjudicated the claim on the merits if I thought the Oklahoma Court of Criminal Appeals abided by the party presentation rule as we do? But if you're right, isn't it an anomaly that you're saying, well, this claim was unexhausted? Well, your whole argument in applying D-1 or D-2 assumes that it was adjudicated on the merits. Well, how could this fundamentally unfair trial claim have been adjudicated on the merits if it wasn't exhausted? It wasn't exhausted because under Donald Grant, for one example, when you so change the nature of a claim with new evidence, new arguments, new case law, then there may have been a claim that was exhausted in the state court, but that is not the same claim that is now in front of this court. Yeah, but that's, I guess, I don't mean to be the dead horse, but isn't that the problem? The theoretical anomaly of your argument is you're saying the claim that these petitioners are presenting to us was unexhausted. And yet, because they transformed the claim from what had been presented in the direct appeal of the Oklahoma Court of Criminal Appeals, and yet your argument on D-1 and D-2 presume that the claim that they are presenting to us was adjudicated on the merits. Well, how could the Court of Criminal Appeals have adjudicated the claim on the merits of the claim that they're presenting to us if it had never been presented to them? Well, I think Your Honor recognized when you cited Wellman that the claim that's presented now is not the one that the Court of Criminal Appeals adjudicated. But isn't Wellman the only way you could address that? And to apply Wellman, you would have to assume, because Wellman deals with the application of D-1. So wouldn't, to apply Wellman, we have to reject actually what you just said, that is, they didn't exhaust it. They did exhaust it, which would be a precondition of applying Wellman versus CBOC. Do you understand what I'm asking? I think I understand, Your Honor, although I don't know how you can reconcile that with Don's grant and the fundamental changes to this claim. I certainly agree. I'm willing to set aside, although not waive, set aside for the purposes of this discussion exhaustion. But I would say that under Sexton versus Beaudreau and under Wellman, this court is still limited to the arguments that were made to the Court of Criminal Appeals. What is the basic principle behind exhaustion? To give the state court a fair opportunity to decide the merits of the claim. And you're saying because there's no reference to this particular evidence or the closing or things like that in the presentation to the OCCA, that those portions, at least, of the claim were not exhausted. Is that your position? That is. And I believe Gray versus Netherland says that the facts, in order to exhaust the facts, do have to be before the state court. Now, I understand that this court has held, and I think the Supreme Court as well, that a fact or two here or there that doesn't significantly change the nature of the case doesn't implicate exhaustion. But here, we have far beyond that. And does the same argument, and it's not just the facts, but you have to say that you can't say before the OCCA that evidence was inadmissible because of hearsay and now give a different argument for why it was. That's correct. Yes. The argument, the facts, the focus, the degree of focus, was this Burke's? Is this Burke's evidence, other crimes' evidence? Or was this an all-out assault on Ms. Andrews' femininity? Those are also very different focuses. I want to put in context for the court how incredibly difficult it's going to be for a petitioner to establish a right to relief on this claim. Under Oklahoma's statute, Section 2403, which mirrors this court's 403, the admissibility of evidence, and not as a constitutional matter, but just the admissibility of evidence, you have relevance and you have unfair prejudice. Evidence can be admissible even if it's more unfairly prejudicial than probative. To be inadmissible, the unfairly prejudicial effect has to substantially outweigh the relevance. Are you suggesting that we can review that decision? No, I'm not. I'm going to go on to the next two layers to explain how difficult the standard is in this case. But then you go beyond that to the fundamental fairness analysis. You may already have this. To prove a fundamentally unfair trial, you have to prove that the prejudicial nature so overwhelmed the irrelevance that it rendered the entire trial fundamentally unfair. But this case has a third layer, and that's AEDPA. Then the question is, is it the case that no fair-minded jurist to conclude that we didn't get to hear to be so substantially outweighed that she was denied a fundamentally fair trial? And we submit in light of the evidence in this case, particularly the overwhelming nature of guilt, and our position is the very limited nature of the improperly admitted evidence that petitioner cannot meet that threshold. What about the failure to provide limiting instructions? That's involved in that analysis too, doesn't it? It does, and the court from Lockhills addressed that and found it harmless. This court addressed it in its first decision and also found it to be harmless. And the jury wasn't completely left without any guidance. There was the instruction in both stages that told them that they were not to render their verdict based on sympathy or prejudice, except in second stage they could have sympathy for petitioner. So they were told that defense counsel made the point, look, what the state's trying to do here is they're trying to make you think that she's guilty by making you think that she's a bad person. Basically the implication was don't let them do that. Look at the evidence. And the state's closing argument, sure they referenced affairs. They had to. It was part of the motive in this case. But the state's closing argument did not focus on the contested irrelevant evidence, not in the least. And I don't think that I can do any better than to say what this court already said in this case, which is as to cumulative error. Now, this first part that I'm talking about, this court did not consider the irrelevant evidence because you had found a lack of clearly established law. So I'm going to caveat it with that. But you found it evident that the trial was fundamentally fair. And you said that you were confident that cumulative error relief was not required. You found that the errors were of minor significance when viewed against the backdrop of the entire proceeding and the overwhelming evidence. But you didn't leave it there because you also, the majority, responded to the dissent. And the dissent had found cumulative error based on the evidence that's contested today, the lack of the instruction, three exclusive defense witnesses, which aren't before the court anymore, that's law of the case, and a Miranda violation. So all of that and the dissent review was de novo. And this court said in footnote 56, even if the dissent's unprecedented approach were justified by a Supreme Court holding, we would still rule that the overwhelming evidence of Ms. Andrews' guilt would outweigh any harm from the dissent's combined constitutional violations. And no, you didn't phrase it in the negative. We would still find that the unfairly prejudicial effect didn't so overwhelm the relevance as to establish a fundamentally unfair trial. No, you said that the overwhelmings of guilt would outweigh any harm. So the inverse. Is that law of the case? That is a very good question, Your Honor. I... No. I believe... Yes, no, no. So far, it's one-to-one. Let me ask you a question about limited instruction. Sure. Does it matter whether limiting instructions were requested by the defendant? They were requested. I don't believe... They asked for limiting instructions on all of it. They didn't at the time the evidence was introduced. They did ask for limiting instructions. I believe at the beginning of the trial and certainly in the instruction conference. Now, I don't recall, you know, whether they specifically pointed it to each item of contested evidence. Of course, a lot of it wasn't even objected to at trial. However, state law does require the instruction to be given even if not requested. Now, it's not clear, too. The state argued that some of the evidence was res geste for which the limited instruction was not required. So when the Court of Criminal Appeals found error in not giving that instruction, it's not clear which particular pieces of evidence they were pointing to. But even assuming that all of the evidence that is properly before the court and that was improperly admitted is considered with the lack of the instruction, this court has already determined that that's wrong. Did the trial judge explain, give any response to why she didn't give the limited instruction? Not in great detail. The state objected, said that it was res geste. I presume that may have been, but that's a presumption on my part. She didn't add anything additional? Correct. Would a limiting instruction have been required in every instance on count one, a conspiracy count? In other words, do you see what I'm saying? As to the... No, I'm sorry. That it wouldn't be 403. It would, for the conspiracy, be evidence of a crime. Probably not with respect to the affairs with Mr. Nunley and Mr. Higgins. Certainly, much of the evidence that established the relationship between... All of the evidence that established the relationship between Petitioner and Mr. Pravat was helpful to establish the conspiracy, yes. If the court doesn't have any further questions, we would respectfully ask you to follow what you did in your first opinion and to affirm the district court's decision. Thank you. We just have three quick points, Joanna, and I don't want to try to call out patience discussing things we've already been talking about. First, the state continues to argue that this case wasn't really about sex stereotyping and nothing could be further from the truth. Counting up days on one side that have more evidence of gender bias than days on another is not the inquiry that's before this panel. It's the fundamental fairness of the whole proceeding. You did say in your brief, though, that every day. Yes. Is that accurate? Yes, Your Honour. We've provided the string site with examples of those every day. I'm afraid I don't have every day at the tip of my tongue, but day 11 was one that was cited, for example. On day 11, Dean Gigstad was testifying about whether or not Miss Andrew went skinny dipping in a hot tub on her property, and the prosecution followed up with another question about whether she was skinny dipping. That evidence cannot but put an image of her body in the minds of jurors, and our brief has a string site. As to other examples, that came in every single day. Second, the State acknowledges that this case was about Miss Andrew's character. We agree. It was about her character as a woman and her transgression on the basis of an immutable trait, and there had to be limits to what the... But the argument here was that she was the one who raised character. So the fact that it was a trial regarding character, if that's how the defence frames it, and is arguing that she was a good wife, a good mother, a good Christian, etc., that is important to the context of what the State is arguing, is it not? Yes, Your Honour. Miss Andrew cannot open the door to things that came in in the State's opening argument, and the structure of the State case was about far more than responding to a comment, was she a good... It's a two-word question. Good mother, he confirms good mother. This is Nunley at the start of trial. And nevertheless, before all of that, there's the testimony from Mr Higgins, which we talked about. We don't need to go over that again. But saying that the flooding of this trial with gender bias, with evidence designed to sex shame her, by saying that she opens the door to that with one question, I think is not an argument that holds water here. And my third point is the limiting instruction. On page 105-106 of the trial transcript, it's the first time that the defence requested a limiting instruction, and specifically requested it with respect to the affairs, and asked that the trial judge instruct the jury on the permissible inferences that they could draw about Ms Andrews' affairs. I don't have anything further, so if there are no questions from the panel, we would respectfully ask that this court remand Grant LeRitt and other issues for a new trial for Ms Andrews. Thank you, counsel. Thank you. It's really not a substantive question, it's really a record question, because one of the things that I was looking for, because both of you disagree about a particular recording call, and whether or not you could hear Brenda Andrews' voice on the recorded call on November 19th, the day before the murder. There was differing interpretations of whether or not you could hear Mr Andrews coaching Frisidy. I looked for the audio, and I don't know if that's... I know it's part of the trial court record, and it was played with the district trial court. Are you all confident that that is in the record? I may have overlooked it. I'm afraid I haven't heard that recording, Your Honor, but we can absolutely look for that and submit a 28-day letter advising if it's part of the record. Thank you. Yes, thank you. Thank you, counsel. The case was very well argued. It makes our job just that much harder. Thank you. Counselor Stewart, the court is adjourned.